UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-CV-84

| | |
|---|---|
| BEULAH JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | O R D E R |
| ) | |
| KMART CORPORATION and ) | |
| BOBBY HAMILTON, Individually, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on defendants' motion for summary judgment. The motion has been fully briefed and is ripe for disposition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff began her employment with defendant Kmart Corporation ("Kmart") in September 1972. (Verified Compl. ¶ 4; Pl. Aff. ¶ 2; Pl. Dep. at 7, 15.) In approximately January 2000, Kmart promoted plaintiff to the position of human resources manager[1] at Store No. 4826 in Fayetteville, North Carolina, at a salary of $13.41 per hour, and she had that position until December 2004. (Verified Compl. ¶ 5; Pl. Aff. ¶ 2; Pl. Dep. at 22.) Defendant Bobby Hamilton ("Hamilton") became plaintiff's store manager in October 2004. (Verified Compl. ¶ 6; Hamilton Dep. at 18.) Hamilton was told by the district manager that Store No. 4826 "was a disaster[,] . . . . out of control . . . . There was nothing in the store that was up to any standard that Kmart Corporation wanted." (Hamilton Dep. at 18-19.)

As a human resources manager, plaintiff's job duties included creating the weekly work schedule for all employees at Store No. 4826, supervising the employee review process, maintaining

---

[1] Kmart had various titles for this position, but the essential duties remained the same. (Hamilton Dep. at 33.)

the store's personnel files according to Kmart corporate policy, tracking employees' vacation time, maintaining the employee training room and training new employees, and doing the payroll. (Pl. Dep. at 26-27, 32, 39, 45-46, Hamilton Dep. at 24, 33, 40, 45, 50.)

In January 2003, plaintiff had been placed on a thirty-day probation for failing "to insure [sic] that all associates understand the vacation policy and that all procedures concerning the payment of vacation to active and terminating associates are handled properly." (Pl. Dep., Defts.' Exh. 9; see also Pl. Aff. ¶ 6.) Plaintiff received an annual review on 27 October 2004. (Pl. Aff., Exh. 1 (10/27/04 evaluation).) Although the overall review found that plaintiff "exceed[ed] expectations," it noted (among other things) that plaintiff "must develop a way to stay current on paperwork . . . [and] must strive to improve her time use and completion of schedules and associate evaluations."[2] (Pl. Aff., Exh. 1 (10/27/04 evaluation); see also Pl. Dep. at 100 (plaintiff was told during the evaluation "to please try to make sure that [she] kept [her] paperwork up").)[3] Hamilton testified that between October and December 2004, he counseled plaintiff[4] on several perceived deficiencies in her work, including problems with the weekly work schedule, filing, and improper

---

[2] Employee reviews were performed annually and formed the basis for each employee's annual pay raise, so an employee would not receive a pay raise until his or her review was completed and "keyed into the system" by the human resources manager. (Hamilton Dep. at 34.) When Hamilton discovered the backlog in employee reviews, "[s]ome of the associates dated back . . . eight months to a year . . . . and so [Kmart] had associates that were being paid large sums of money as back pay." (Hamilton Dep. at 134.)

[3] Plaintiff acknowledges that she had gotten behind in maintaining her paperwork while she took some personal leave earlier in 2004, and that it may not have been "completely caught up" between October 2004, when she received her annual review, and December 2004, when Hamilton demoted her. (Pl. Dep. at 158.)

[4] In her affidavit submitted in opposition to the instant motion, plaintiff disputes that Hamilton "[]ever counseled [her] regarding [her] performance[,]" (Pl. Aff. ¶ 8); however, for the reasons stated *infra*, the court finds that this is not an issue of material fact precluding entry of summary judgment.

recording of employees' vacation time.[5] (Hamilton Dep. at 29, 42, 47.) However, Hamilton "never used the word[s] Kmart policies or endangering her job." (Hamilton Dep. at 51; see also Pl. Aff. ¶ 8 ("Hamilton never told [plaintiff] that [her] position was in danger until the meeting in which [she] was demoted").)

A Kmart employee "from regional human resources" came to Store No. 4826 in December 2004, "just prior to [plaintiff]'s release from personnel manager" and told Hamilton that plaintiff's office "was the worst personnel office that he had ever been in" and that Hamilton "needed to remove [plaintiff] from that position. That she did not know what she was doing." (Hamilton Dep. at 60.) Hamilton demoted plaintiff on 22 December 2004. (Hamilton Dep. at 60.) Prior to demoting plaintiff, Hamilton "discussed it with [his] district manager . . . . [and] it was a mutual decision" to demote her. (Hamilton Dep. at 65.) As reasons for the demotion, Hamilton listed untimely employee raises and backpay, complaints from associates, plaintiff's "disorganized office," and plaintiff's failure to adequately, correctly and timely make the weekly employee schedule. (Pl. Dep., Defts.' Exh. 11.)

Hamilton promoted Becky Archibald to the human resources manager position. (Hamilton Dep. at 111.) Archibald was "a white female who was approximately 28 years old" at the time of the promotion, and "had only worked for Kmart . . . for one month" as a cashier. (Pl. Aff. ¶ 9; Hamilton Dep. at 103, 111.) However, "she had . . . been a manager at McDonald's, and . . . . . had experience in managing associates," including training and scheduling employees and "maintain[ing] paperwork[.]" (Hamilton Dep. at 111-12.)

---

[5] Hamilton discovered that plaintiff had recorded several employees' vacations "as salary during the week" rather than vacation time, "which basically allowed an associate to have more time than they needed – were supposed to get for vacation." (Hamilton Dep. at 46.)

Hamilton placed plaintiff in a "temporary position" in customer service "until [he] could find something else for her." (Hamilton Dep. at 72-73.) Plaintiff's transfer to customer service was accompanied by a decrease in her pay, to $11.50 per hour, which was in part a decision of the district manager, who "said that . . . [plaintiff's] pay needed to be similar to the other pay rates" for employees who worked in customer service. (Hamilton Dep. at 73.) Plaintiff's pay was increased to $12.91 per hour in February 2005. (Pl. Dep. at 162.) After transferring plaintiff to the customer service department, Hamilton moved her from being a full-time employee with benefits such as health insurance to a part-time employee with no benefits. (Hamilton Dep. at 82.) In addition, plaintiff was required to work nights and weekends. (Pl. Dep. at 184.) Although moving plaintiff to part-time was in part the result of a Kmart restructuring that required stores to cut the number of employees working full-time, Hamilton's decision to apply the restructuring to plaintiff was the result of his "personal observation[s]" of all the employees at Store No. 4826, including plaintiff. (Hamilton Dep. at 82.) However, when Kmart permitted Hamilton to "have a full-time layaway associate" in April 2005, he offered the job to plaintiff and she accepted it. (Hamilton Dep. at 88-89.) On 3 June 2005, plaintiff injured herself while working in the layaway department, and she has not returned to work at Kmart since that time, although she is eligible. (Pl. Dep. at 146-47; Hamilton Dep. at 98.)

Plaintiff contends that during the time she and Hamilton worked together, Hamilton made several comments to her which she perceived as discriminatory based on either her race or her age.[6] Plaintiff contends that prior to removing her from the human resources manager position, Hamilton made two references to plaintiff using the phrase "black ass," (Pl. Dep. at 113, 115), that he told her

---

[6] Hamilton denies making these comments, (Hamilton Dep. at 97-98), but for the reasons stated *infra*, the court finds that this is not an issue of material fact precluding entry of summary judgment.

4

that he was offering her the full-time position in layaway "to get that monkey off his back[,]"[7] (id. at 121), and that she "'need[ed] to move faster,'" (id. at 123).

Plaintiff called Kmart's regional manager to complain immediately after her transfer to customer service, but spoke "[m]ainly to his assistant" in the phone call. (Pl. Dep. at 165; see also Jemo Dep. at 29 (plaintiff called the regional manager's assistant on one occasion to complain "that she was removed from a position and received a pay decrease"); Pl. Aff. ¶ 10 ("[t]he regional manager . . . refused to talk to [plaintiff, but] . . . . would have his secretary call [plaintiff] back").) Plaintiff also "repeatedly tried to report the situation to [her] district manager[,]" but he "always cancelled or missed [the] . . . appointments" that he scheduled with her to discuss her complaint. (Pl. Aff. ¶ 10.) Kmart did not investigate plaintiff's complaints until after she filed an EEOC charge, and plaintiff did not tell anyone at Kmart that she intended to file an EEOC charge prior to doing so on 10 March 2005. (Pl. Dep. at 164-65; Hamilton Dep. at 15; Jemo Dep. at 34.)

The EEOC sent plaintiff a notice of right to sue, and she filed the instant action on 2 November 2006 in the Middle District of North Carolina. The case was transferred to this district by order filed 22 February 2007, and by order filed 30 July 2007, this court dismissed several claims. As to Kmart, the remaining claims are for violations of 42 U.S.C. § 1981, Title VII, and the Age Discrimination in Employment Act ("ADEA"), as well as state law claims of negligent and intentional infliction of emotional distress. (Verified Compl., Counts I, III-VI.) As to Hamilton, the remaining claims are state law claims of negligent and intentional infliction of emotional distress. (Verified Compl., Counts V-VI..)

---

[7] Although defense counsel characterizes this statement as "a commonly used, racially-neutral phrase," (Br. Supp. Mot. Summ. J. at 21), for purposes of the instant motion, the court accepts plaintiff's contention that it has a racist connotation.

## II.  DISCUSSION

A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate in those cases in which there is no genuine dispute as to a material fact, and in which it appears that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Haavistola v. Community Fire Co. of Rising Sun, Inc.</u>, 6 F.3d 211, 214 (4th Cir. 1993).  Summary judgment should be granted in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law."  <u>Id.</u>  In making this determination, the court draws all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate ."  <u>Teamsters Joint Council No. 83 v. Centra, Inc.</u>, 947 F.2d 115, 119 (4th Cir. 1991).

B.  <u>Race Discrimination Claim</u>

As to plaintiff's race discrimination claim under § 1981 and Title VII,[8] plaintiff lacks any direct evidence of race discrimination,[9] and therefore the court applies the burden-shifting analysis first articulated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04

---

[8] Plaintiff has brought her claim for race discrimination under both Title VII and § 1981, and "the court [may] appl[y] the same analysis . . . under both statutes."  <u>Onuoha v. Grafton School, Inc.</u>, 182 F. Supp. 2d 473, 479 (D. Md. 2002) (citing <u>Spriggs v. Diamond Auto Glass II</u>, 242 F.3d 179, 183 (4th Cir. 2001)).

[9] While plaintiff points to Hamilton's derogatory comments as "direct evidence of [his] racial bias[,]" (Br. Opp. Mot. Summ. J. at 14), isolated comments are insufficient to show direct evidence of racial discrimination.  <u>See Onuoha</u>, 182 F. Supp. 2d at 480 ("all offensive language is not direct evidence [of racial discrimination].  To prove discriminatory animus, the derogatory remark cannot be stray or isolated and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." (quotations, citations, and alteration omitted)).

6

(1973). In order to survive summary judgment, plaintiff must establish a *prima facie* case of discrimination, defendant must in turn offer a legitimate, non-discriminatory reason for the allegedly discriminatory act, and plaintiff must then finally "show that [defendant]'s stated reason for [the act] . . . was in fact pretext." Id. at 804.

> To make out a *prima facie* case of discriminatory demotion, [plaintiff] must demonstrate that: (1) she is a member of a protected class, (2) she was qualified for her job and her performance was satisfactory, (3) despite her qualifications she was removed from her . . . position and reassigned to a[nother] position, and (4) the . . . position remained open to similarly qualified applicants after her reassignment.

Oguezuonu v. Genesis Health Ventures, Inc., 415 F. Supp. 2d 577, 584 (D. Md. 2005). Kmart disputes only the second element of the *prima facie* case. (Br. Supp. Mot. Summ. J. at 15.)

The court agrees with Kmart that plaintiff has failed to demonstrate that her job performance was satisfactory. While plaintiff has asserted her belief that she was performing the human resources job in a satisfactory manner,

> [w]hat matters is not the employee's "self-perception" regarding the quality of his job performance, but "'the perception of the decision-maker. . . .'" Farasat v. Paulikas, 32 F.Supp.2d 249, 255 (D. Md. 1998), aff'd 166 F.3d 1208, 1998 WL 887017 (4th Cir. 1998) (quoting Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)). This is true regardless of the wisdom of the policy in question, or the wisdom of strict adherence to it, neither of which are within the court's purview to question. The court does not sit as a "'super-personnel department'" and thus cannot "decide whether the reason [for the termination] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997)). A plaintiff who violates company policy and fails to improve his performance despite a warning has not demonstrated satisfactory performance. See, e.g., Blair v. Colonnas Shipyard, Inc., 52 F. Supp. 2d 687, 694 (E.D. Va. 1999), aff'd 203 F.3d 819, 2000 WL 4917 (4th Cir. 2000) (finding that an employee who violated policies his employer considered "very important" did not perform his job satisfactorily and therefore did not establish a prima facie case of race discrimination); Farasat, 32 F. Supp. 2d at 254-55 (rejecting discriminatory termination claim of plaintiff who was repeatedly tardy, despite receiving written warnings, and who violated company policy).

7

Mungro v. Giant Food, Inc., 187 F. Supp. 2d 518, 522 (D. Md. 2002).

In the instant case, regardless of whether Hamilton ever counseled plaintiff on any perceived deficiencies in her work, plaintiff's 27 October 2004 annual review, performed by another supervisor, noted that plaintiff was not completing several of her job duties in a timely or adequate manner, and plaintiff herself acknowledged that many of the job performance issues raised in the review had not been fully corrected at the time of her demotion. Plaintiff asserts that she "was correctly handling employee evaluations for several months prior to the demotion[,]" (Br. Opp. Mot. Summ. J. at 6 (citing Pl. Aff. ¶ 3, Hamilton Dep. at 37); however, the employee evaluations were only one reason Hamilton gave for removing plaintiff from the human resources manager position, and he listed employee scheduling as another reason, which had also been an issue in plaintiff's annual review. "Plaintiff has adduced no evidence that the complaints regarding [her] performance were so unfounded as to constitute a pretext for [her demotion] . . . , and can cite no direct or circumstantial evidence of discriminatory . . . animus. Whether [Kmart]'s decision was unfair, rash, or imprudent is irrelevant; in the absence of a discriminatory . . . motive, . . . employment decisions may not be second guessed by this [c]ourt." Bradley v. CMI Industries, Inc., 17 F. Supp. 2d 491, 498 (W.D.N.C. 1998). Accordingly, the court will grant summary judgment to Kmart on this claim.

C.  ADEA Claim

As with plaintiff's race discrimination claim, the court applies the McDonnell Douglas burden-shifting analysis.[10]

---

[10] As with plaintiff's race discrimination claim, she has no direct evidence of age discrimination, because isolated comments are insufficient to constitute direct evidence. See Alderman v. Inmar Enterprises, Inc., 201 F. Supp. 2d 532, 540 (M.D.N.C. 2002) (retiring company president's "observation that he was leaving behind a 'younger organization' was an isolated comment that cannot be attributed to [d]efendants in the form of direct evidence of age discrimination.").

8

> That scheme requires that [p]laintiff prove, by a preponderance of the evidence, a prima facie case of discrimination. To prove her prima facie case, [p]laintiff must establish the following four basic elements:
> 1) that she is a member of the protected age group, that is, at least forty years of age[];
> 2) that she was discharged or demoted from her job;
> 3) that she was performing her job at a level that met her employer's legitimate expectations; and
> 4) following her termination, she was replaced by a substantially younger employee.

Alderman, 201 F. Supp. 2d at 541 (citations omitted).

As with plaintiff's race discrimination claim, the court agrees with Kmart that plaintiff has not shown that she was meeting her employer's legitimate job expectations, and therefore has not made a *prima facie* case. Accordingly, the court will grant summary judgment to Kmart on this claim.

D.  Retaliation Claim

To prove a *prima facie* case of retaliation under Title VII, plaintiff must show that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001). If plaintiff can "establish[] the elements of her *prima facie* case, the burden shifts to [Kmart] to proffer evidence of a legitimate, non-discriminatory reason for taking the adverse employment action." Matvia v. Bald Head Island Mgmt., 259 F.3d 261, 271 (4th Cir. 2001).

The court finds that plaintiff has not established a *prima facie* case. There is no question that plaintiff engaged in activity protected by Title VII when she made her informal complaints to the regional manager and his assistant after being transferred to the customer service position and receiving a pay decrease of approximately fifteen percent. See Laughlin v. Metropolitan

9

Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." (citations omitted)). In addition, there is no question that plaintiff's further demotion to part-time employment – accompanied by a loss of employee benefits – is an adverse employment action. See Jeffers v. Thompson, 264 F. Supp. 2d 314, 329 (D. Md. 2003) ("Inquiry into the adverse nature of an employer's action typically focuses on whether the employee has suffered discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." (citing Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999)).

However, plaintiff has not shown a causal connection between her protected activity and Hamilton's decision to place her on part-time status.[11] The evidence before the court indicates that at the time he made plaintiff a part-time employee, Hamilton was unaware that plaintiff had complained to the regional and district managers and that Kmart did not look into plaintiff's complaints until after plaintiff filed her EEOC charge. (Hamilton Dep. at 15; Jemo Dep. at 34; Pl. Aff. ¶ 10.) Plaintiff offers only her speculation that "[a] manager of . . . Hamilton's experience could easily predict that such complaints would lead to an EEOC charge[,]" (Br. Opp. Mot. Summ.

---

[11] Because Kmart focuses primarily on the filing of plaintiff's EEOC charge and plaintiff's transfer from part-time in customer service to full-time in layaway, (Br. Supp. Mot. Summ. J. at 23-25), the court quickly reviews the evidence in the case in the light most favorable to plaintiff. Hamilton removed plaintiff from the human resources manager position to a position in customer service, and gave her a pay decrease of approximately fifteen percent. (Hamilton Dep. at 72-73.) Plaintiff then made several complaints about the transfer to the regional manager and/or his assistant and her district manager, and Hamilton gave plaintiff a pay raise (which was still below plaintiff's salary as human resources manager), but cut plaintiff from full-time to part-time status, meaning that she lost employee benefits such as health insurance. (Pl. Dep. at 165; Jemo Dep. at 23; Hamilton Dep. at 82.) The court agrees with Kmart that plaintiff's subsequent transfer to a full-time position in layaway was not an adverse employment action under Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (under Title VII, an adverse employment action must be material, such that it is "likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers" (quotation and citation omitted)).

J. at 15), yet acknowledges that she did not tell anyone at Kmart that she planned to file an EEOC charge, (Pl. Dep. at 164-65). Thus, the court concludes that plaintiff has not shown a sufficient causal connection between her complaints to the district and regional managers and Hamilton's decision to cut plaintiff's hours and benefits, and will award summary judgment to Kmart on this claim. See Byers v. HSBC Finance Corp., 416 F. Supp. 2d 424, 440 (E.D. Va. 2006) (granting summary judgment to employer on retaliation claim where employee complained to superiors about sexual advances by his supervisor and suffered an adverse employment action but "the evidence show[ed] that [the supervisor] did not know that [the employee] ever complained of sexual harassment until after [the employee] left employment with [the defendant].").

E.   State Law Claims

The court agrees with defendants that they are also entitled to summary judgment on plaintiff's claims for intentional and negligent infliction of emotional distress.

> To prevail on the claim of intentional infliction of emotional distress, [p]laintiff must show: (1) that the [d]efendant engaged in extreme and outrageous conduct; (2) that the conduct was intended to cause severe emotional distress; and (3) that the conduct does in fact cause severe emotional distress. See Waddle v. Sparks, 331 N.C. 73 (1992). Whether the alleged conduct is sufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress is a question of law. See Lenins v. K-Mart Corp., 98 N.C. App. 590, 599 (1990). To be considered "extreme and outrageous" the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493 (1986). Furthermore, it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress.

Thomas v. Northern Telecom, Inc., 157 F. Supp. 2d 627, 634-35 (M.D.N.C. 2000) (some quotations and citations omitted). Plaintiff contends that defendants engaged in extreme and outrageous conduct when they "demoted [her] without warning[,] . . . . required [her] to work with people whom

11

she had just supervised[, and] . . . . replaced [her] with a young, white employee who had worked for Kmart Corporation for only one month and who did not know the store's personnel or procedures." (Br. Opp. Mot. Summ. J. at 19-20.) Thus, it appears that "the sole basis for [p]laintiff's IIED claim . . . is [d]efendant[s'] . . . employment discrimination. This allegation of discrimination alone, even if true, simply cannot rise to the level of extreme and outrageous behavior." Faulkner v. Tyco Electronics Corp., 552 F. Supp. 2d 546, 558 (M.D.N.C. 2008) (citations omitted).

> With regard to plaintiff's claim for negligent infliction of emotional distress,
>
> [p]laintiff must show that [d]efendant[s] (1) negligently engaged in conduct, (2) which would reasonably and foreseeably cause [p]laintiff's severe emotional distress, and (3) which did, in fact, cause severe emotional stress . . . . [Additionally,] a plaintiff claiming NIED must still prove that her employer should have realized that its conduct involved an unreasonable risk of causing emotional distress, Johnson v. Ruark Obstetrics and Gynecology Assocs., P.A., 327 N.C. 283, 304 (1990). She must also show that her employer was aware that such distress might result in her illness or bodily harm. Id.

Faulkner, 552 F. Supp. 2d at 559 (some citations omitted). The court agrees with defendants that plaintiff has not shown that she suffered severe emotional distress.

> Presumably, any termination will cause the discharged employee some degree of emotional upset. Plaintiff has not alleged any facts that indicate the [d]efendants should have reasonably foreseen that [p]laintiff would react in any way other than the usual anger and disappointment associated with being discharged.
> . . . .
> Severe emotional distress is "any emotional or mental disorder, such as for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson, 327 N.C. at 304. Additionally, "mere temporary fright, disappointment or regret will not suffice." Id.
> . . . .
> [Plaintiff's] conclusory statement[s regarding her distress are] not sufficient to state a claim for intentional or negligent infliction of emotional distress.

Swaim v. Westchester Academy, Inc., 170 F. Supp. 2d 580, 584-85 (M.D.N.C. 2001) (some citations

omitted).

## III.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is ALLOWED, and this action is hereby DISMISSED.

This 16 September 2008.

                                                  W. Earl Britt
                                                  Senior U.S. District Judge

bj/kmt/tec